O'DELLE B. MORRIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morris v. Commissioner
Docket No. 1644-71.
United States Tax Court
T.C. Memo 1973-182; 1973 Tax Ct. Memo LEXIS 105; 32 T.C.M. (CCH) 852; T.C.M. (RIA) 73182; August 20, 1973, Filed O'Delle B. Morris, pro se. Melvern Stein, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency of $5,781.71 in petitioner's 1967 Federal income tax and an addition to tax of $289.09 under section 6653(a). [1] The issues are: (1) whether petitioner had unreported taxable gambling *106 income in 1967, and, if so, in what amount, and (2) whether the addition to tax under section 6653(a) is applicable. 2 FINDINGS OF FACT Petitioner, O'Delle B. Morris, was a legal resident of San Diego, California, at the time her petition was filed in this Court. She filed her Federal income tax return for 1967 with the district director of internal revenue, Los Angeles, California. During 1967, petitioner was the owner and operator of a beauty shop in San Diego, California. The gross receipts from this business for 1967 were $7,965.32. In December 1967, she sold three hydraulic chairs which were in the shop for $275. In addition, she received $1,144 from two beauticians who rented booths in her shop, and $44.21 in interest. Besides her activities as a beauty shop operator, petitioner was an avid horse-racing fan. She normally traveled to the Caliente Racetrack (hereinafter Caliente) in Tijuana, Mexico, each weekend to place bets on the Sunday races. She always purchased at least one 5-10 ticket and frequently bet on other *107 races. The 5-10 is a feature event at Caliente in which the ticketholder attempts to select the winning horses in the fifth through tenth races. In addition to picking the horses they believe will win each race, ticketholders also make alternative selections for each race in the event any of the horses they originally selected are scratched. 3 The 5-10 tickets are sold in multiples of two dollars. Petitioner normally takes $25 of her own money to the racetrack each weekend for bets. However, the actual amount she bets on any particular weekend depends on her winnings. If she has won money on the first four races, she sometimes bets as much as $25 on the last races. Petitioner did not keep a record of her winnings and losses at the racetrack in 1967. On Sunday, November 19, 1967, petitioner attended the races at Caliente. While she was there she saw her housekeeper, a Mexican National named Alecia. Alecia suggested that petitioner join her and two of her friends in purchasing $20 worth of 5-10 tickets. Petitioner agreed and gave Alecia $5 as her share of the cost of the venture. Petitioner did not meet the other two participants. Alecia used the money to purchase *108 three 5-10 tickets - one for $16 and two for $2 each. After the end of the fifth race, Alecia left the racetrack to spend the holidays in Mexico. At that time, she gave the tickets she had purchased to petitioner. Because of the weather, petitioner went home after the sixth race. It was not until the next day that petitioner learned some of the horses selected on one of the 5-10 tickets she had 4 purchased with Alecia and her friends had won. When she went to Caliente on November 21, 1967, she was informed that one of the tickets in which she had participated had won $22,703. Petitioner's share of the ticket's winnings was $5,675.75. While she was at the racetrack, she collected $5,000 of her share and left the remainder of the total winnings there with the understanding that the money could be collected at a later date. Petitioner's wagering losses for 1967 did not exceed her other winnings for that year. On November 21, 1967, petitioner had $2,000 of the money she won deposited in her savings account at the Security First National Bank and had $1,500 of the winnings, along with $200 from her business, deposited in her checking account at that bank. On the same *109 date, she went to Texas to visit her ailing mother who was in the hospital. When she left, she took the remaining $1,500 she had received at Caliente, along with $850 she received from her son and approximately $950 she had previously saved for the trips. While she was in Texas, she used an unspecified portion of this money to pay various expenses incurred by her family. She was reimbursed for these expenses before she returned to California on December 3, 1967. 5 Shortly after the beginning of 1968, Alecia returned from Mexico. On January 7, 1968, petitioner met her at the racetrack, and they collected the rest of the winnings on the ticket. Of this amount, petitioner received only the remainder of her one-quarter share in the proceeds. Alecia received her own share of the winnings as well as the shares of the other two participants. Petitioner does not know the other participants, nor does she know whether Alecia gave them their shares of the winnings. The next day, Alecia asked petitioner if she could keep her share of the money in petitioner's beauty shop. Petitioner refused this request since she was afraid the money would be stolen if it were kept there. Instead, *110 the parties decided that they would each put $5,000 in a savings account in petitioner's name, and petitioner agreed to give Alecia her share of the money whenever she wanted it. In line with this understanding, Alecia gave petitioner $5,000 on January 8, 1968, and accompanied her to the Home Federal Savings and Loan Association of San Diego (hereinafter Home Federal). At that time, petitioner opened a savings account at Home Federal in her name as trustee for her grandchildren and deposited the $10,000 in that account. She did not intend to make a gift of this money to her grandchildren. 6 The $5,000 which petitioner deposited in this account was composed of the money she had when she returned from Texas, earnings from her business, and the remainder of her share in the winning ticket at Caliente. This was the only deposit either party made in this account. During the next 9 months, petitioner gave Alecia money whenever she asked for it. Petitioner would either withdraw this money from the Home Federal account or use her own funds. By November 1968, petitioner had returned all of Alecia's money and Alecia's share of the interest from the Home Federal account. As *111 of November 4, 1968, the balance in this account was $5,582.71. On an unspecified date in 1968, Alecia returned to Mexico. The last time petitioner saw her was when she visited petitioner's home in 1969. Petitioner does not know where Alecia is presently living. On February 5, 1968, petitioner and her son opened a savings account as joint tenants at the First Federal Savings and Loan Association of San Diego, and petitioner deposited $1,500 in that account. The source of this deposit was earnings from petitioner's business and amounts she had won at the races after the beginning of 1968. This was the only deposit ever made in that account 7 by either petitioner or her son. During 1967, petitioner's daughter and the daughter's two children lived in petitioner's home and were dependent upon petitioner for their support. The family was supported by the earnings from petitioner's business and her racetrack winnings. In her 1967 Federal income tax return, petitioner reported $3,624 as miscellaneous income from "Races." Petitioner arrived at this figure by subtracting the amount she estimated she had bet in 1967 ($1,376) from the $5,000 she received at Caliente on November 21, 1967. *112 The remaining portion of petitioner's winnings - which was received on January 7, 1968 - was reported in petitioner's 1968 Federal income tax return. In the notice of deficiency, respondent determined that petitioner was taxable on the full amount of the November 21, 1967, winnings ($22,703), increasing petitioner's taxable income by $19,079. This additional income was computed by treating the rest of the November 21, 1967, winnings ($17,703) as taxable to petitioner and disallowing the deducted losses ($1,376). 8 OPINION The present controversy is primarily concerned with whether petitioner was the sole owner of the winning 5-10 ticket. If this were the case, then petitioner's 1967 income from that ticket would be $22,703 rather than $5,675.75, [2] which she claims was her share of the winnings. In addition, the amount of petitioner's wagering losses in controversy. *113 Petitioner has the burden of proving that respondent's determination was incorrect. Rule 32, Tax Court Rules of Practice. Ordinarily, we would expect petitioner to have called one or more of the other participants in the 5-10 venture to testify as to whether petitioner had only a 25-percent interest in the ticket. However, petitioner explained, credibly we think, that she was unable to locate any of these individuals. Instead, she has given her own testimony regarding this transaction and introduced various exhibits to support her statements. While there are 9 suspicious circumstances, we think her testimony that she owned only a 25-percent interest in the winning ticket, when viewed in light of the entire record, is credible. The record clearly shows that throughout this period petitioner has had only a relatively small amount of income. The only accretions to her wealth which occurred after the November 19, 1967, race were the deposits she made in various bank accounts. These deposits and their sources are referred to in our Findings. Petitioner has adequately shown that these increases were not due to her having more than a 25-percent interest in the ticket. Throughout *114 the trial there were several references to an extensive, detailed investigation of petitioner's financial affairs conducted by Internal Revenue Service personnel. These investigations led neither to a criminal prosecution nor the assertion of fraud penalties, and none of the fruits of that investigation was introduced as evidence to refute petitioner's testimony that she owned and received only 25 percent of the November 19, 1967, winnings. As to the other factor regarding petitioner's taxable income from the racetrack - whether she is entitled to a 10 deduction under section 165(d) [3] for wagering losses [4] - her evidence is weak. Petitioner admitted that she kept no records of her winnings or losses at the racetrack during 1967. Based on our examination of the record, we do not think she has shown that, disregarding the November 19, 1967, win, she had any wagering losses in 1967. In other words, the full amount of her winnings of $5,675.75 from the 5-10 ticket is includable in her 1967 income without any deduction for gambling losses. *115 11 The last issue is whether petitioner is subject to the addition to tax imposed by section 6653(a). [5] Petitioner has the burden of proving that no part of the underpayment of her 1967 tax was "due to negligence or intentional disregard of rules and regulations." James S. Reily, 53 T.C. 8, 14 (1969). Petitioner has offered no explanation for her failure to keep any type of record of her winnings and losses at the racetrack during 1967. Cf. sec. 6001. In view of this, we are compelled to uphold respondent's determination. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted. ↩
2. As reflected in our Findings, petitioner reported as 1967 income only the $5,000 she received in 1967, and she testified that she reported the remainder of her 25-percent share in her 1968 return. Since she could have received the entire $5,675.75 in 1967, the whole amount is taxable in that year. Sec. 1.451-2(a), Income Tax Regs.↩
3. SEC. 165. LOSSES. * * * (d) Wagering Losses. - Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions. ↩
4. On brief, petitioner maintains that she should also be allowed a loss deduction for the money she paid "for parking, taxi, gas and seats." Since this issue was not raised in the pleadings and there is no evidence in the record concerning these expenses, we will not consider this matter. ↩
5. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. ↩